UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. |
| | : | |
| | : | VIOLATIONS:  18 U.S.C. § 371, 1341, 2, |
| | : | 981, 28 U.S.C. § 2461 |
| v. | : | (Conspiracy to Defraud the United States, |
| | : | Mail Fraud, Causing an Act to Be Done, |
| | : | Forfeiture) |
| EDWARD JAVIER, | : | |
| | : | |
| Defendant. | : | |

## INFORMATION

The United States Attorney and the United States Department of Justice, Criminal Division, Fraud Section, charge that at all times material to this Information:

## INTRODUCTION

1. EDWARD JAVIER ("JAVIER") was the owner and president of Lifeline Infinity, Inc. ("Lifeline Infinity"), a company that was in the business of selling medical supplies to nursing homes. Lifeline Infinity was not in the business of exporting goods overseas. From in or about February 2003 through in or about July 2003, JAVIER, through Lifeline Infinity, acted as a purported "exporter" in a $1 million fraudulent loan transaction, falsified documents sent to a United States bank and to the Export-Import Bank of the United States ("Ex-Im Bank"), and misappropriated approximately $870,000 in loan proceeds that were guaranteed by the Ex-Im Bank.

2. Co-Conspirator 2 ("CC-2") was a Philippine national who arranged the fraudulent loan transaction, assisted JAVIER in executing the fraudulent loan transaction, and directed JAVIER how the fraudulent loan proceeds should be distributed.

3. US Bankcorp was a lending bank with operations in Minneapolis, Minnesota, and was the lender in the fraudulent loan transaction.

4. The Ex-Im Bank was an independent agency of the executive branch of the United States and located in Washington, D.C. It was also the official export credit agency of the United States. The mission of Ex-Im Bank was to assist in the export of United States goods and services to companies overseas. One of the ways Ex-Im Bank fulfilled this mission was by issuing loan guarantees to United States banks on behalf of creditworthy foreign companies for the purpose of purchasing United States goods. Once Ex-Im Bank issued a loan guarantee, if the foreign borrower defaulted on its loan repayments to a United States bank, the Ex-Im Bank paid the amount of the outstanding loan to the United States bank. Before issuing a loan guarantee, Ex-Im Bank required that a United States exporter - the person or entity shipping the United States goods on behalf of the foreign borrower - certify to the Ex-Im Bank the type, amount, and value of the United States goods that it would be shipping and that the goods shipped were made in the United States. Relying on information provided by JAVIER and others, Ex-Im Bank provided US Bankcorp with a loan guaranty, promising that the Ex-Im Bank would reimburse US Bankcorp for any losses it incurred in the fraudulent loan transaction.

**COUNT ONE**
**(CONSPIRACY TO DEFRAUD THE UNITED STATES)**

THE CONSPIRACY

5. Paragraphs 1 through 4 of this Information are realleged and incorporated by reference as if set out in full.

6. From in or about February 2003 through in or about July 2003, in the District of

Columbia and elsewhere, JAVIER, CC-2, and others known and unknown did unlawfully and knowingly agree, combine and conspire together and with each other and others to defraud the United States and agencies thereof and to commit offenses against them, to wit:

    a.    to defraud the United States of and concerning its governmental functions and rights, including its right to have the business of the Ex-Im Bank conducted honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction, in violation of Title 18, United States Code, Section 371;

    b.    to defraud the United States of and concerning its right to have its officers and employees, and particularly the personnel of the Ex-Im Bank, free to transact the official business of the United States unhindered, unhampered, unobstructed and unimpared by the exertion upon them of dishonest, corrupt, unlawful, improper and undue pressure and influence, in violation of Title 18, United States Code, Section 371;

    c.    to defraud the Ex-Im Bank, an agency of the United States, to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 371; and

    d.    to knowingly devise, and intend to devise, through the use of the mail, a scheme and artifice to defraud the United States and the Ex-Im Bank, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, in violation of Title 18, United States Code, Section 1341.

### A GOAL OF THE CONSPIRACY

7.    A goal of the conspiracy was for the co-conspirators, including JAVIER, to unlawfully enrich themselves by submitting false and fraudulent information to the Ex-Im Bank, through the lending bank, to obtain and misappropriate the loan proceeds.

### THE MANNER AND MEANS OF THE CONSPIRACY

8.    To achieve the goal of the conspiracy, JAVIER, CC-2, and others used the following manners and means, among others:

      A.      CC-2 identified a purported borrower in the Philippines and a lending bank in the United States and assisted the Philippine borrower in executing a loan agreement with the lending bank and the Ex-Im Bank;

      B.      CC-2 instructed JAVIER to prepare false documents that would be submitted to the lending bank and the Ex-Im Bank to facilitate the fraudulent loan transaction;

      C.      JAVIER prepared false documents stating that United States goods had been purchased and shipped to the Philippine borrower and then submitted those documents to Ex-Im Bank, through the lending bank; and

      D.      JAVIER received the proceeds of the bank loan, retained a portion of that money for his own personal benefit and use, and then transferred the remaining loan proceeds as directed by CC-2.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

9.      Within the District of Columbia and elsewhere, in furtherance of the above-described conspiracy, and in order to carry out the goal thereof, JAVIER, CC-2, and others known and unknown, committed the following overt acts, among others:

      A.      In or about February 2003, JAVIER met with CC-2 and agreed that JAVIER, through Lifeline Infinity, would act as "exporter" in a loan transaction brokered by CC-2 between a Philippine borrower and a United States lending bank, in which the Ex-Im Bank was guaranteeing the loan. CC-2 agreed to pay JAVIER a fee of approximately 1.5% of the value of the purported goods to be shipped.

      B.      In or about February 2003, CC-2 instructed JAVIER that the lending bank would

not pay loan proceeds to Lifeline Infinity until the bank and the Ex-Im Bank received a Commercial Invoice, Packing List, and Ex-Im Bank Supplier's Certificate documenting the amount, value, and origin of United States goods shipped to the Philippines.

      C.      In or about May 2003, JAVIER executed a false Commercial Invoice and Packing List documenting approximately $1 million worth of United States goods that he had purportedly purchased and shipped to the Philippine borrower. At the time these documents were executed, JAVIER and CC-2 knew that the representations made by JAVIER on the Commercial Invoice and Packing List falsely represented the amount, value, and origin of the United States goods purchased and shipped to the Philippines.

      D.      In or about May 2003, JAVIER executed a false Ex-Im Bank Supplier's Certificate certifying that he had purchased and shipped approximately $1 million worth of United States goods to the Philippine borrower. At the time this document was executed, JAVIER and CC-2 knew that the representations made by JAVIER on the Ex-Im Bank Supplier's Certificate falsely represented the amount, value, and origin of the goods purchased and shipped to the Philippines.

      E.      In or about May 2003, JAVIER sent to Ex-Im Bank, through the lending bank, the Commercial Invoice, Packing List, and Ex-Im Bank Supplier's Certificate that he executed, as proof that he had purchased and shipped approximately $1 million worth of United States goods to the Philippine borrower. Both JAVIER and CC-2 knew at the time that the Commercial Invoice, Packing List, and Ex-Im Bank Supplier's Certificate falsely represented the amount, value, and origin of the goods purchased and shipped to the Philippines.

F.  In or about June 2003, Lifeline Infinity received approximately $870,000 in loan proceeds from the lending bank based on JAVIER's false representations to the lending bank and the Ex-Im Bank that Lifeline Infinity had spent approximately $1 million to purchase United States goods and had shipped those goods to the Philippines. JAVIER and CC-2 knew at the time that JAVIER and Lifeline Infinity had actually spent an amount materially and substantially less than $1 million on the United States goods purchased and shipped to the Philippines. After receiving the approximately $870,000 in fraudulent loan proceeds, JAVIER kept approximately $13,000 of the loan proceeds, transferred approximately $550,000 of the loan proceeds to bank accounts owned or controlled by CC-2 and others, and transferred approximately $300,000 to a company in the United Kingdom.

**(Conspiracy to Defraud the United States, in violation of Title 18, United States Code, Section 371)**

## Count Two
### (Mail Fraud)

10. Paragraphs 1 through 4 and 9 of this Information are realleged and incorporated by reference as if set out in full.

11. From in or about February 2003 through in or about July 2003, in the District of Columbia and elsewhere, JAVIER, and others, known and unknown, did knowingly devise and intend to devise a scheme and artifice to defraud the Ex-Im Bank, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, used a commercial interstate carrier.

12. On or about June 17, 2003, JAVIER and others, known and unknown,

for the purpose of executing the scheme and artifice to defraud, did knowingly cause to be delivered through Federal Express, a commercial interstate carrier, an Ex-Im Bank Supplier's Certificate to US Bankcorp, knowing that it would be forwarded to the Ex-Im Bank.  JAVIER knew at the time that the pretenses, representations, and promises contained in the Ex-Im Bank Supplier's Certificate as to the amount, value, and origin of the goods shipped to the Philippines were materially false when made.

**(Mail Fraud, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1341 and 2)**

## FORFEITURE

13.     As a result of the mail fraud offense alleged in Count Two of the Information, which is realleged and incorporated by reference for the purpose of alleging forfeitures to the United States of America pursuant to Title 18, United States Code, Section 981, and Title 28, United States Code, Section 2461(c), defendant JAVIER shall, upon conviction of such offense alleged in the Information, forfeit to the United States all property, real and personal, which constitutes or is derived from proceeds traceable to the mail fraud offense, wherever located, and in whatever name held, including, but not limited to a sum of money equal to the amount of proceeds obtained as a result of the mail fraud in violation of Title 18, United States Code, Section 1341.  By virtue of the offense charged in Count Two of the Information, any and all interest that the defendant has in the property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such offenses is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 981, in conjunction with Title 28, United States Code, Section 2461(c).

14. In the event that any property described above as being subject to forfeiture, as a result of any act or omission by the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to or deposited with a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 981 and Title 28, United States Code, Section 2461, to seek forfeiture of any other property of JAVIER up to the value of the above described property.

**(Forfeiture, Title 18, United States Code, Section 981, Title 28, United States Code, Section 2461)**

JEFFREY A. TAYLOR
United States Attorney
In and For the District of Columbia

By: _____/s/_____
MICHAEL K. ATKINSON
D.C. Bar # 430517
Assistant United States Attorney
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 616-3702

                STEVEN A. TYRRELL
                Chief, Fraud Section
                Criminal Division
                United States Department of Justice

By:    _____/s/_____
                HANK BOND WALTHER
                D.C. Bar # 477218
                Trial Attorney
                Fraud Section, Criminal Division
                United States Department of Justice
                1400 New York Avenue, NW
                Washington, D.C. 20005
                (202) 257-6176

Date:   March 13, 2008