# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 08- 060-RWR |
| | : | |
| | : | VIOLATIONS: 18 U.S.C. §§ 371, 1341, 2, |
| | : | 981, 28 U.S.C. § 2461 |
| v. | : | (Conspiracy to Defraud the United States, |
| | : | Mail Fraud, Causing an Act to Be Done, |
| | : | Forfeiture) |
| EDWARD JAVIER, | : | |
| | : | **FILED** |
| Defendant. | : | |

APR 3 0 2008

Clerk, U.S. District and
Bankruptcy Courts

## STATEMENT OF THE OFFENSE

1.      From in or about February 2003 until in or about July 2003, EDWARD JAVIER

("JAVIER") was the owner and president of Lifeline Infinity, Inc. ("Lifeline Infinity"), a

company that was in the business of selling medical supplies to nursing homes.  Lifeline Infinity

was not in the business of exporting goods overseas.  From in or about February 2003 until in or

about July 2003, JAVIER, through Lifeline Infinity, acted as a purported "exporter" in a

$1 million fraudulent loan transaction, falsified documents sent to a United States bank and to

the Export-Import Bank of the United States (the "Ex-Im Bank"), and misappropriated

approximately $870,000 in loan proceeds that were guaranteed by the Ex-Im Bank.

2.      In or about February 2003, JAVIER met with a co-conspirator ("CC-2") and

agreed that JAVIER, through Lifeline Infinity, would act as "exporter" in a loan transaction

brokered by CC-2 between a Philippine borrower and a United States lending bank, in which the

Ex-Im Bank was guaranteeing the loan.  CC-2 agreed to pay JAVIER a fee of approximately

1.5% of the value of the purported goods to be shipped.

3.      In or about February 2003, CC-2 instructed JAVIER that the lending bank would

not pay loan proceeds to Lifeline Infinity until the bank and the Ex-Im Bank received a

Commercial Invoice, Packing List, and Ex-Im Bank Supplier's Certificate documenting the

amount, value, and origin of United States goods shipped to the Philippines.

      4.     In or about May 2003, JAVIER executed a false Commercial Invoice and Packing

List documenting approximately $1 million worth of United States goods that he had purportedly

purchased and shipped to the Philippine borrower. At the time these documents were executed,

JAVIER and CC-2 knew that the representations made by JAVIER on the Commercial Invoice

and Packing List falsely represented the amount, value, and origin of the United States goods

purchased and shipped to the Philippines.

      5.     In or about May 2003, JAVIER executed a false Ex-Im Bank Supplier's

Certificate certifying that he had purchased and shipped approximately $1 million worth of

United States goods to the Philippine borrower. At the time this document was executed,

JAVIER and CC-2 knew that the representations made by JAVIER on the Ex-Im Bank Supplier's

Certificate falsely represented the amount, value, and origin of the goods purchased and shipped

to the Philippines.

      7.     In or about May 2003, JAVIER sent to the Ex-Im Bank, through the lending bank,

the Commercial Invoice, Packing List, and Ex-Im Bank Supplier's Certificate that he executed,

as proof that he had purchased and shipped approximately $1 million worth of United States

goods to the Philippine borrower. Both JAVIER and CC-2 knew at the time that the Commercial

Invoice, Packing List, and Ex-Im Bank Supplier's Certificates falsely represented the amount,

value, and origin of the goods purchased and shipped to the Philippines.

      8.     In or about June 2003, Lifeline Infinity received approximately $870,000 in loan

2

proceeds from the lending bank based on JAVIER's false representations to the lending bank and the Ex-Im Bank that Lifeline Infinity had spent approximately $1 million to purchase United States goods and had shipped those goods to the Philippines. JAVIER and CC-2 knew at the time that JAVIER and Lifeline Infinity had actually spent an amount materially and substantially less than $1 million on the goods purchased and shipped to the Philippines. After receiving the approximately $870,000 in fraudulent loan proceeds, JAVIER kept approximately $13,000 of the loan proceeds, transferred approximately $550,000 of the loan proceeds to bank accounts owned and controlled by CC-2 and others, and transferred approximately $300,000 to a company in the United Kingdom.

9.     On or about June 17, 2003, JAVIER knowingly caused to be delivered through Federal Express, a commercial interstate carrier, an Ex-Im Bank Supplier's Certificate to US Bankcorp, knowing at the time that it would be forwarded to the Ex-Im Bank. JAVIER knew at the time that the pretenses, representations, and promises contained in the Ex-Im Bank Supplier's Certificate as to the amount, value, and origin of the goods shipped to the Philippines were materially false when made.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.

DATE: _4·30·08_

_____
EDWARD JAVIER
Defendant

_____
BRIAN J. VIRAG, ESQ.
Attorney for Defendant

4