UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **Criminal No. 08-060 (RWR)** |
| | : | |
| **EDWARD JAVIER,** | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia and the Fraud Section of the Criminal Division, United States Department of Justice, hereby submits this Memorandum in Aid of Sentencing defendant Edward Javier. Pursuant to a plea agreement, the defendant pleaded guilty to one count of conspiracy to defraud the United States (18 U.S.C. § 371), one count of mail fraud (18 U.S.C. § 1341), and criminal forfeiture. As discussed below, the government requests that the Court (1) impose a sentence at the low end of the stipulated United States Sentencing Guidelines range of 24-30 months, (2) impose a three year term of supervised release, and (3) require the defendant to pay $684,943.35 in restitution.

## FACTUAL BACKGROUND

On March 13, 2008, the United States Attorney's Office and the Fraud Section of the Criminal Division, United States Department of Justice, filed a two-count Information charging Javier with one count of conspiracy to defraud the United States (18 U.S.C. § 371), one count of mail fraud (18 U.S.C. § 1341), and criminal forfeiture. On April 30, 2008, Javier pleaded guilty to the charges.

In pleading guilty, Javier admitted that from approximately February 2003 through July 2003, he was the owner and president of Lifeline Infinity, Inc. ("Lifeline Infinity"), a company that was in the business of selling medical supplies to nursing homes. Javier also admitted that from approximately February 2003 through July 2003, he acted a purported "exporter" in a $1 million fraudulent loan transaction that was guaranteed by the Export-Import Bank of the United States ("Ex-Im Bank"). Javier admitted that in connection with this loan transaction, he falsified documents sent to a United States bank and to the Ex-Im Bank to make it appear that he would use the loan proceeds to reimburse himself for $1 million worth of United States goods that he claimed to have purchased and shipped to a borrower in the Philippines. In reality, Javier did not purchase the United States goods he claimed to have purchased and shipped. Instead, once the lending bank and the Ex-Im Bank funded the approximately $870,000 loan, based upon Javier's false representations, Javier kept approximately $13,000 of the proceeds, transferred approximately $550,000 of the loan proceeds to bank accounts owned and controlled by a co-conspirator in the Philippines and others, and transferred approximately $300,000 to a company in the United Kingdom.

**SENTENCING FACTORS**

Title 18, United States Code, Section 3553(a), provides numerous factors that the Court shall consider in sentencing Javier. These factors are discussed below numbered as they are in Section 3553(a).

**(1)   The nature and circumstances of the offense and the history and characteristics of the defendant.**

   **(A)   Nature and circumstances of the offense**

This case illustrates how a government program intended to benefit United States businesses, by increasing United States exports to companies overseas, can be exploited by United States citizens looking to make a quick dollar. In administering its insurance and guarantee programs, the Ex-Im Bank relies on United States-based exporters to provide truthful information about the legitimacy of the transactions in which they engage. Because the Ex-Im Bank provides insurance products and guarantees to borrowers in foreign countries, and often borrowers in third world nations, they rely on United States exporters to certify that loan proceeds will be used to reimburse the exporters for United States goods that were actually purchased and shipped to the borrowers. Without this certification, which is contained in the Ex-Im Bank Supplier's Certificate, the transaction cannot be completed.

Javier abused this trust by intentionally making false statements on an Ex-Im Bank Supplier's Certificate and on related documents that he prepared for the sole purpose of misappropriating the loan proceeds. Instead of purchasing $1 million worth of United States goods and shipping them to borrowers in the Philippines, Javier pocketed $13,000, transferred approximately $550,000 to bank accounts owned or controlled by a co-conspirator in the

Philippines and others, and transferred approximately $300,000 to a company in the United Kingdom.

### (B) The history and characteristics of the defendant

Javier was born and raised in the Philippines and immigrated to California at age twenty-five. He graduated from high school in the Philippines and attended three years of college at the University of the East in Manila, Philippines. Javier appears to have maintained legitimate jobs for several years, until agreeing to engage in the fraudulent scheme that formed the basis for these charges. The PSR indicates that from 1998 through 2003, Javier worked as manager of the enteral nutrition division at Western Pharmacy and had annual gross earnings of $60,000 a year. Javier quit this job to begin Lifeline Infinity, that company through which he engaged in the scheme to defraud the Ex-Im Bank.

Javier has a large family, which includes five sisters, three brothers, and seven children whose ages range from 14 to 32. All of these individuals currently live in the United States. Javier had four children with Teresa Padua, with whom Javier lived for approximately eight to nine years, that are currently 32, 27, 25, and 24 years old. Javier has three children with his current wife Ana Julie Javier, that are currently 22,15, and 14 years old. The PSR notes that Javier and his current wife Ana Javier live separate lives and that Javier "keeps most maters secret" from Ana Javier.

> **(2)** **The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the pubic from further crimes of the defendant; and (D) to provide defendant with appropriate education or vocational training.**

As the world becomes smaller and sophisticated fraud schemes targeting the United States extend beyond the borders of the United States, it is important for the Court to impose sentences on the United States-based conspirators, without whom the fraud could not occur, that will adequately deter future crimes. Although Javier does not appear to have orchestrated this crime, he was a willing participant and an essential figure in its execution. Without Javier, the crime could not succeed. As the Court is aware, this is one of several related cases that involve schemes to defraud the Ex-Im Bank. It appears that the type of scheme in which the defendant engaged is becoming all too common. As in the case with all newly budding crimes, it is important for the Court to illustrate that these new crimes will not be tolerated and that the perpetrators of such crimes will be severely punished for their actions.

The government recognizes, however, that the significance of Javier's crime and the need to deter future crime should be counterbalanced with the defendant's timely acceptance of responsibility when confronted by law enforcement agents and the fact that he only made $13,000 in profit from the $1 million crime. Although we do not believe Javier's personal profit mitigates his responsibility for the full $1 million crime, we do believe it is a factor that may be considered along with Javier's timely acceptance of responsibility, in fashioning an appropriate sentence within the guidelines range.

As to the final consideration, the defendant does not appear to need further education or vocational training.

    **(3)    The kinds of sentences available**

The maximum term of imprisonment for conspiracy to defraud the United States is 5 years in prison, with a term of supervised release of not more than 3 years. The maximum term

of imprisonment for mail fraud is 30 years, with a term of supervised release of not more than 5 years.

**(4)   The sentencing range established by the United States Sentencing Guidelines ("USSG")**

As to these guidelines, the government and the defendant stipulated in the plea agreement to a Total Adjusted Offense Level for the offense of 17.  Assuming a Criminal History category I (which the PSR recommends), the resulting USSG range is 24-30 months.

The Probation Office concurs with the Total Adjusted Offense Level described above. *See* PSR at 8-9.

In the plea agreement, the parties stipulated that the applicable fine range is $250,000 per count or twice the pecuniary gain or loss.  The Probation Office calculates the maximum fine as twice the pecuniary gain, or $1,369,868.70.  *See* PSR at 20, ¶ 86.

**(5)   Any pertinent policy statement issued by the USSC**

The government is unaware of any pertinent policy statements issued by the USSC.

**(6)   The need to avoid unwarranted sentencing disparities among defendants with similar records**

A guidelines sentence would help prevent such disparities between the defendant and similar defendants.  This is a reasonable sentencing range under the circumstances here, particularly in the context of the Court's prior sentences of other similarly situated defendants:

- Robert Delgado was sentenced to 24 months incarceration by this Court on October 5, 2007.  *See United States v. Robert Delgado*, Cr. 06-0313 (RWR). Delgado, who had not provided substantial assistance to the government at the

- time of his sentencing, was part of a $2.1 million scheme to defraud the Ex-Im Bank and personally received $100,000 of the scheme's proceeds.
- David Villongco was sentenced to 33 months incarceration by this Court on February 29, 2007.  *See United States v. David Villongco*, Cr. 07-00009 (RWR). Villongco had provided substantial assistance to the government at the time of his sentencing and the Court granted the government's motion for downward departure based on his substantial assistance.  Villongco engaged in a $20 million scheme to defraud the Ex-Im Bank and personally received approximately $150,000 of the scheme's proceeds.
- Daniel Curran was sentenced to 41 months incarceration by this Court on April 23, 2008.  *See United States v. Daniel Curran*, Cr. 07-00057 (RWR).  Curran provided substantial assistance to the government at the time of his sentencing and the Court granted the government's motion for downward departure based on his substantial assistance.  Curran engaged in a $30 million scheme to defraud the Ex-Im Bank and personally received approximately $400,000 of the scheme's proceeds.
- Edward Chua was sentenced to 37 months incarceration by this Court on May 14, 2008.  *See United States v. Edward Chua*, Cr. 07-0122 (RWR).  Chua provided substantial assistance to the government at the time of his sentencing and the Court granted the government's motion for downward departure based on his substantial assistance.  Chua engaged in a $10 million scheme to defraud the Ex-

    Im Bank and personally received approximately $300,000 of the scheme's proceeds.

**(7) The need to provide restitution**

The defendant has agreed to forfeit to the United States at the time of sentencing the $13,000 in proceeds he received from the fraud. The Court should find that defendant Javier is responsible, jointly and severally with his co-conspirators, for the entire loss affiliated with the fraudulent loan transaction, which amounts to $684,943.35.

## RECOMMENDATION

Javier was the essential player in a scheme to defraud the Ex-Im Bank of approximately $870,000. As a United States-based exporter, he was the one person that the Ex-Im Bank could rely upon to ensure the legitimacy of the underlying bank loans to Philippine borrowers and to ensure that the Ex-Im Bank, and accordingly the American taxpayers, were truly supporting United States exports and not giving free money to criminals in the Philippines. Due to the significance of the crime, the international nature of the crime, Javier's role as the sole known United States-based participant, and the need to deter future crime, a Guidelines sentence is warranted. However, due to Javier's timely acceptance of responsibility when confronted by law enforcement agents and the fact that he only made $13,000 in profit from the $1 million crime, the government requests a sentence at the low end of the Guidelines range of 24-30 months. *See United States v. Rita*, ___ U.S. ___, 127 S. Ct. 2456, 2465 (2007) ("when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable"); *United States v. Dorcely*, 454 F.3d 366, 376 (D.C. Cir. 2006) ("a sentence within a properly

calculated Guidelines range is entitled to a rebuttable presumption of reasonableness" by an appellate court). The government also requests that the Court impose a three year term of supervised release and require the defendant to pay restitution of $684,943.35.

                Respectfully submitted,

                JEFFREY A. TAYLOR
                United States Attorney
                In and For the District of Columbia


By:         /ss/
                MICHAEL K. ATKINSON
                D.C. Bar # 430517
                Assistant United States Attorney
                Fraud and Public Corruption Section
                555 4th Street, N.W.
                Washington, D.C. 20530
                (202) 616-3702


                STEVEN A. TYRRELL
                Chief, Fraud Section
                Criminal Division
                United States Department of Justice


By:         /ss/
                HANK BOND WALTHER
                D.C. Bar # 477218
                Trial Attorney
                Fraud Section, Criminal Division
                United States Department of Justice
                1400 New York Avenue, NW
                Washington, D.C. 20005
                (202) 257-6176

Date:  July 11, 2008